UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

DELARRY NORFOLK,

                        Plaintiff,                Case No.: 12-cv-10338
                                               Honorable Avern Cohn
             v.                       Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                        Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

Plaintiff DeLarry Norfolk brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.      **RECOMMENDATION**

For the reasons set forth below, the court finds that the decision that Norfolk is not disabled is supported by substantial evidence of record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Norfolk's motion [10] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On February 17, 2009, Norfolk filed an application for DIB, alleging disability as of November 7, 2007. (Tr. 93-101). The claim was denied initially on June 15, 2009. (Tr. 59-62). Thereafter, Norfolk filed a timely request for an administrative hearing, which was held on February 18, 2010, before administrative law judge ("ALJ") Beverly Parkhurst. (Tr. 23-57). Norfolk, represented by attorney Akisha Johnson, testified, as did vocational expert ("VE") Dennis Gustafson. (*Id.*). On February 23, 2010, the ALJ found Norfolk not disabled. (Tr. 7-22). On November 21, 2011, the Appeals Council denied review. (Tr. 1-5). Norfolk filed for judicial review of the final decision on January 25, 2012 [1].

B.     **Background**

1.     *Disability Reports*

In a disability report filed on March 21, 2009, Norfolk reported that the conditions preventing him from working were herniated discs in his neck and back, and pain in his right shoulder, arm and hands. (Tr. 121). He reported that these conditions limited his ability to work as they caused him pain in his neck and back and limited strength in his right arm. (*Id.*). He stated that he stopped working on November 7, 2007, because "my condition from the injury left me unable to perform my job duties." (*Id.*). Norfolk reported being treated by several doctors and a physical therapist for his conditions and that he was prescribed Vicodin for pain, a side effect of which was irritability. (Tr. 124).

In an April 7, 2009 function report, Norfolk reported that he lives in a house with family and that his daily activities consist of "bathing, watching TV, and sleeping." (Tr. 141). His conditions affect his ability to sleep because his neck hurts "sometimes" when he lies down. (Tr.

142).  He also reported that personal care "takes longer" and that he needs "some help."  (*Id.*).
He does not cook, but he does light laundry and washes the dishes, which takes him about three
hours.  (Tr. 143).  He reported needing help putting clothes in the dryer.  (*Id.*).  He also does not
do yard work because pushing the lawn mower hurts his neck and back.  (Tr. 144).  He goes
outside two to three times a week, but does not drive because it causes pain.  (*Id.*).  He shops in
stores for food and other personal items monthly.  (*Id.*).  His hobbies had consisted of bowling
and playing cards, but he no longer does these things because he cannot pick up a ball or sit long
enough to play cards.  (Tr. 145).  Now he watches television and movies "daily."  (*Id.*).  He
reported not being able to socialize due to the side effects of his medication.  (Tr. 146).

Norfolk reported that his conditions affect his ability to lift, squat, bend, stand, reach,
walk, sit, kneel, concentrate, and use his hands.  (*Id.*).  He reported that he can only lift one
pound, that squatting hurts his back and bending his neck and back hurts "after a few minutes."
(*Id.*).  His hands are also "painful when moving."  (*Id.*).  He reported that he can stand for five
minutes and walk 1 block before needing a five minute break, sit for 10 minutes, kneel for 2
minutes, and concentrate for 10 minutes, although he then said he could pay attention for 15
minutes.  (*Id.*).  In a disability appeals report filed on June 29, 2009, Norfolk reported no changes
in his condition.  (Tr. 152-56).

### 2.    *Plaintiff's Testimony*

At the hearing, Norfolk testified that he was injured at work in 2007.  (Tr. 33).  As he was
off-loading a truck he felt some pain in his neck and shoulder, reported it to his supervisor and
was sent for a medical evaluation.  (*Id.*).  When he first went to the doctor, he was told he simply
had a strain.  (Tr. 37).  While he admitted that at first his doctor told him he could go back to
work with restrictions, Norfolk testified that his job did not have a position that accommodated

his restrictions, so he could not return to work.  (*Id.*).  Then "my condition got worse," he testified.  (*Id.*).  He testified that the conditions preventing him from working were pain in his neck and lower back and weakness in his right arm.  (Tr. 41).  He attempted to seek other work and then was put on long-term disability.  (Tr. 33-34).  Norfolk testified that he has attempted physical therapy three times to improve his condition but that he has had no other treatment, such as steroid injections.  (Tr. 34).  He testified that he was told surgery was his only option and that he was told by someone in pain management that "there was basically nothing he could do."  (*Id.*).

Norfolk testified that he had previously been on Vicodin, muscle relaxers, and Ibuprofen 800, but was currently taking only over-the-counter medication because he said his doctors would not give him any more narcotics.  (Tr. 37-38).  He testified that he could lift ten pounds, walk 30 yards, stand 10 or 15 minutes and sit the same amount of time.  (Tr. 38).  He testified that the pain was in his neck and radiated down his right arm into the last two fingers on his hand.  (*Id.*).  He also had pain in his lower back.  (*Id.*).  The pain lasts about eight hours of the day, and is exacerbated by lifting, turning the wrong way or sitting too long.  (Tr. 39)  He testified to being prescribed physical therapy exercises that he is supposed to do three times a day, but that he usually only does them twice a day.  (*Id.*).  His other daily activities include sitting and a little walking "to stretch muscles in my lower back."  (*Id.*).  Norfolk testified that he drives approximately twice a week "a couple of miles" at the request of his doctor.  (Tr. 39-40).  He testified that can dress and bathe himself "80 percent of the time," and at other times his wife helps him.  (Tr. 41).  He also testified that he uses a cane to help him walk and stand, but that it was not prescribed by a doctor.  (Tr. 42).  When asked why he could not work at a job that requires him to sit or stand in place, Norfolk testified, "[I]f I could find a job where I could sit 15

4

minutes, yeah.  I mean, that would allow me to be flexible and take my medicine.  I mean, I probably could.  I mean, but not longer than 15, 20 minutes." (*Id.*).  He also testified that Vicodin and Ibuprofen 800 made him drowsy.  (*Id.*).  When the ALJ pointed out that he was not currently taking that medication, however, Norfolk agreed that was the case; but, he testified that he would like to be taking the medications, but his doctors would not prescribe them.  (Tr. 43).  He also testified that he was not currently participating in physical therapy because he was told by someone at physical therapy that additional therapy would be "a waste of time." (*Id.*).  He testified that he uses Bio-Freeze and a heating pad to help manage his pain.  (Tr. 44).

### 3.    Medical Evidence

#### a.    Treating Sources

##### i.    Neck Pain and Radiculopathy

On November 7, 2007, Norfolk was seen by Dr. Stephen Daly at Concentra Medical Center immediately after his work accident.  (Tr. 183).  He complained of pain his right lower neck and shoulder at an intensity of 6/10, which did not radiate.  (*Id.*).  Upon examination, Dr. Daly found intact reflexes and senses, and full strength in Norfolk's upper extremities.  (*Id.*).  He found a full range of motion and good nerve function in Norfolk's right shoulder and a strong grip and bicep strength, but pain with pulling.  (Tr. 184).  Dr. Daly diagnosed a "mild" shoulder and cervical strain, recommended ice, stretching and ibuprofen.  (*Id.*).  Norfolk's activity status was "regular activity off rest of shift.  May be at slower rate 11/8…" (*Id.*; Tr. 287).

On November 9, 2007, Norfolk returned to Concentra for a recheck.  He reported that his symptoms were stable and that he had not been working because light duty was not available for him.  (Tr. 185).  He had not noticed any improvement in the pain and he had gone to the emergency room the prior day and received Naproxen, Flexeril and Darvocet for his pain, which

helped "somewhat." (*Id.*). He classified his pain as 8/10 and stated that it radiated to his right arm, but he denied "any significant radiating pain, numbness, burning, tingling or weakness of the upper or lower extremities." (*Id.*). He reported that his symptoms were exacerbated by reaching overhead, pulling or reaching above the shoulders, and were alleviated by medication and rest. (*Id.*). Upon exam, Dr. Anna Jonascu-Devine found no tenderness to palpation of the cervical paraspinals. (*Id.*). His cervical range of motion was "within normal limits and pain-free." (*Id.*). There were no muscle tone abnormalities. (*Id.*). Regarding his right shoulder, the doctor found tenderness "of the posterior aspect of the shoulder over the trapezius and rhomboid." (*Id.*). She also found a full range of motion with pain in all directions. The nerves and pulses in Norfolk's right arm were normal. (*Id.*). The doctor diagnosed a shoulder and cervical strain and recommended continuing the medications as prescribed by the emergency room, and icing the area. (Tr. 185-86). She also prescribed physical therapy. (Tr. 186). She limited Norfolk's activity to no lifting, pushing or pulling over 10 pounds, and no reaching above shoulders. (*Id.*; Tr. 308-309). X-rays of the cervical spine taken on November 16, 2007, showed "some degenerative narrowing at the C5-6-7 levels" and x-rays of the right shoulder taken the same day were negative. (Tr. 331).

At a follow-up appointment on November 17, 2007, Norfolk reported that his symptoms had not improved and that his pain was a 7/10. (Tr. 187). He reported that his arm seemed "cold and weak at times," and that he had a "burning[,] throbbing pain" in it with lifting. (*Id.*). He told the doctor that his primary physician had ordered x-rays of his neck and shoulder. (*Id.*). Upon examination, Dr. Daly found normal reflexes, senses and strength in Norfolk's upper extremities, a full range of cervical motion with no tenderness, and a full range and strength in his right shoulder. (*Id.*). Dr. Daly noted tenderness at the right trapezius, but strong grip and bicep

6

strength.  (*Id.*).  The nerves and pulses were also normal.  (*Id.*).  A preliminary reading of both shoulder and cervical x-rays appeared normal.  (*Id.*).  Norfolk was diagnosed with cervical strain, his previous medications were discontinued and he was prescribed only Naproxen.  (*Id.*).  He was still limited to no lifting, pushing or pulling of more than 10 pounds.  (Tr. 188).  X-rays of Norfolk's right shoulder taken on November 19, 2007, were normal.  (Tr. 329).  X-rays of his cervical spine taken on the same day showed "[d]egenerative changes with bilateral foraminal stenosis," that was "most severe at C3-C4, C4-C5 and C6-C7 on the left as well as the C3-C4 on the right."  (*Id.*).  X-rays of the thoracic spine taken on the same day showed "very mild dextroconvex in centered about the mid to lower thoracic region which may be positional.  There is no evidence of fracture, subluxation or disc space narrowing."  (*Id.*).

At a November 21, 2007 follow-up, Norfolk reported continued neck pain that radiated to his right ring and little finger that also resulted in numbness and was worse with lifting.  (Tr. 189).  He classified his pain as 6/10 and stated that he still had not been working, but again, only because his employer could not accommodate his "light duty" restrictions.  (*Id.*).  Upon examination, all reflexes and senses were intact and strength was 5/5.  (*Id.*).  Norfolk had a full range of motion in his cervical spine, with pain at full rotation and a positive Spurling test.  (*Id.*).  His right shoulder exhibited a full range of motion as well but with pain with elevation above 100 degrees.  (*Id.*).  He was found to have a strong grip and bicep strength, and normal pulses and nerve function.  (*Id.*).  He was diagnosed with cervical radiculopathy and was advised to continue with his medication as prescribed, schedule therapy and continue his previous restrictions.  (*Id.*; Tr. 305).

On the same day, Norfolk had a physical therapy assessment.  (Tr. 190-93).  He reported pain for the past two weeks, that medication did not help and that his symptoms had worsened.

(Tr. 190).  He reported not working because there was "[n]o modified duty available."  (*Id.*).  His pain was reported as being in his right shoulder blade, the front of his chest, and shooting pain down the back of his upper arm and forearm.  (*Id.*).  He also reported numbness and tingling in his ring and little fingers.  (*Id.*).  He classified his pain as a 5-7/10.  (*Id.*).  Upon examination, Norfolk's sensation was grossly intact and his cervical range of motion was generally normal and pain free, except that he only had 90% flexion and pain at the end range in his right upper thoracic region.  (Tr. 190-91).  He had a normal Spurling test, although with pain at the right mid scapular region.  (Tr. 191).  His grip strength was decreased in his right arm compared with his left.  (Tr. 192).   The physical therapist found that his examination was consistent with a diagnosis of a shoulder/trapezius strain and cervical strain and was "somewhat consistent" with a cervical radiculopathy.  (*Id.*).  She prescribed a course of therapy and modalities to resume full function.  (Tr. 193).

Norfolk underwent physical therapy thirteen times; on November 26-30, 2007, and December 3, 5, 7, 10, 12, 14, 19 and 21, 2007.   (Tr. 195-203; 206-213; 216-24; 226-31).  Although the physical therapy treatment notes show that Norfolk's progress was slow, by his 13th visit on December 21, 2007, he reported "feeling improved overall, no tingling into [his] finger anymore" and although "numbness remains in mid 1/3 forearm" it was "no real problem during [the] day[,] worse at night."  (Tr. 229).  He was determined to be "improving well" with treatment.  (*Id.*).

At a follow-up appointment on November 28, 2008, with Dr. Daly, Norfolk reported 50% improvement in his condition with medication and physical therapy and that "the tingling in his right hand is resolving."  (Tr. 204).  His pain intensity was 6/10.  (*Id.*).  Upon examination, Norfolk's cervical range of motion was normal "other than a 20% decrease in flexion with pain."

(*Id.*).  Bilateral shoulder range of motion was normal and his strength and grip strength were normal as well.  (*Id.*).  His deep tendon reflexes were equal and normal and his senses were intact to light touch distally.  (*Id.*).  He was restricted no lifting or pushing or pulling over 20 pounds.  (Tr. 205).  An MRI conducted on November 29, 2007, showed "tiny central protrusions of the C3-C4 and C4-C5 discs" and a "larger protrusion of the C4-C5 disk on the right and there is a small broad base disc protrusion at C5-C6.  All of these cause effacement of the spinal cord." (Tr. 328).  The MRI also noted "some narrowing of the left C4-C5 neural foramen."  (*Id.*).

At a December 5, 2007 follow-up appointment with Dr. Mark Nugent, Norfolk continued to indicate that he had "not been working because of no light duty available.  (Tr. 214).  He also reported a 50% improvement in his condition from the physical therapy sessions.  (*Id.*).  Upon examination Dr. Nugent found no pain and a full range of motion in Norfolk's thoracic region, although there was discomfort with palpation over the right rhomboid.  (*Id.*).  He noted that Norfolk complained of parasthesia along the vental/medial forearm and the fourth and fifth digits of his right arm, and the assessment was a mild ulnar neuropathy with source unknown.  (*Id.*). Dr. Nugent assessed a thoracic and shoulder strain and ordered an EMG to assess his neuropathy. (*Id.*).  He released Norfolk to work with restrictions of no repetitive lifting, or pushing or pulling over 20 pounds.  (Tr. 279).

At a follow-up with Dr. Daly on December 14, 2007, Norfolk reported that "his shoulder and upper arm feel much better" and that he was "taking less medication."  (Tr. 225).  He reported that the tingling in his right arm was improving and that he was "feeling substantially better."  (*Id.*).  Upon examination he had a full cervical range of motion with pain upon full flexion, and a negative Spurling test.  (*Id.*).  He had a full range of motion in both upper extremities and a strong grip and bicep strength.  (*Id.*).  Dr. Daly did note a "tenderness in the

right deltoid and in the right trapezoid area, worse with gripping and pulling." (*Id.*). He diagnosed a cervical strain and limited Norfolk to "modified activity, no repetitive lifting over 20 pounds, no pushing or pulling over 20 pounds." (*Id.*; Tr. 284). He estimated that the "[a]nticipated maximum medical improvement is one week." (*Id.*). He also continued Norfolk's physical therapy course. (*Id.*). At a December 21, 2007 follow-up with Dr. Daly, Norfolk reported that he was "improving slowly" but that he "would like to return back to his regular work." (Tr. 232). He continued to complain of some pain and numbness in his right shoulder that was worse at night, although he also reported feeling "80% better" and that he felt that he could "do his regular work." (*Id.*). There are no EMG results in the record, however, Dr. Daly noted that the EMG had come back "essentially negative." (*Id.*). Upon examination, Norfolk was noted to have a full range of motion in his cervical, thoracic, and lumbar spine. (*Id.*). He had a full range of motion in both shoulders and full strength in his grip, biceps, triceps and shoulders. (*Id.*). He also had 2/4 brachioradialis deep tendon reflexes. (*Id.*). The doctor diagnosed shoulder pain and released Norfolk to return to "regular activity"/"regular duty" on a "trial basis". (*Id.*; Tr. 289). As a result, he also indicated that Norfolk was "to continue his home exercise program …[and] hold on further physical therapy at this time." (Tr. 232).

At a recheck appointment with Dr. Nugent on December 27, 2007, Norfolk reported that he had attempted to return to work and his pain was now "as bad as before." (Tr. 233). Upon examination he had a good range of motion in his right shoulder, but complained of discomfort in his posterior shoulder, and minimal pain upon palpation. (*Id.*). There was tenderness with palpation of his upper right scapula at the rhomboid with a trigger point noted. (*Id.*). After palpation, Norfolk reported parasthesia down his right arm to his fingers. (*Id.*). However, Dr. Nugent found his grip strength to be 5/5 and no paresis was noted. (*Id.*). A neurological exam

yielded "intact" results.  (*Id.*).  Dr. Nugent diagnosed Norfolk with shoulder and thoracic strain and he referred him to a physical medicine specialist.  (Tr. 233-34).  He also placed Norfolk on restrictions of no lifting, pushing or pulling of more than 15 pounds.  (*Id.*; Tr. 288).  He instructed Norfolk to take over-the-counter medications for pain and noted that Norfolk had voluntarily stopped taking Motrin due to concerns about stomach problems.  (Tr. 234).

At an appointment with his primary care physician Dr. Sudhir Walavalkar on January 2, 2008, Norfolk reported that he had an EMG performed which came back normal, but that he still had pain on his right side below the clavicle, near the scapula.  (Tr. 259).  He also complained of occasional tingling and numbness in his arm "whenever he holds the arm for a long time," but reported "[n]o weakness."  (*Id.*).  He was recommended to follow up with a "Dr. Mudge" and return in two months.  (*Id.*).

Norfolk was seen by physical medicine specialist Dr. Jai-Duck Liem on January 10, 2008.  (Tr. 235).  He reported on and off pain and numbness of his right arm, and numbness in the last two fingers of his right hand, but not much pain to his neck.  (*Id.*).  Upon exam, Dr. Liem noted a slightly weakened grip in Norfolk's right hand.  (*Id.*).  A sensory test was "unremarkable," and an Adson's test was negative.  (Tr. 235-36).  Norfolk had a full range of motion in his cervical spine and his right shoulder and his deep tendon reflexes were 1+ bilaterally.  (Tr. 236).  There was no muscular atrophy and only minimal tenderness noted.  (*Id.*).  There was no evidence of impingement or instability.  (*Id.*).  Dr. Liem noted that a previous MRI had found disc protrusion at C4-C5 and C5-C6, and that "clinically he also had evidence of the right C8 radiculopathy."  (*Id.*).  However, Dr. Liem noted that the MRI, as read, did not discuss the area between C7 and T1, so he requested a discussion with the radiologist to determine the condition of that area to assess whether or not it comported with the preliminary diagnosis of C8

11

radiculopathy.  (*Id.*).  Dr. Liem noted that "[i]n the meantime . . . [Norfolk] will continue with self exercises program based on his strengthening exercises to his right hand and if the strengthening exercise of his right hand he may be able to return to work with lifting not more than 20 pounds [ ], not more than 20 pounds pushing and pulling."  (*Id.*; Tr. 312).

Norfolk returned to Dr. Liem on January 24 and January 31, 2008, but failed to make contact with the physician who read the MRI, nor did he bring the MRI film to Dr. Liem as requested.  (Tr. 236-39).  Dr. Liem continued to find intrinsic right arm weakness and recommended that Norfolk seek the opinion of a neurosurgeon or orthopedic spine surgeon.  (Tr. 238).  In the interim, Dr. Liem restricted Norfolk to no lifting or pushing or pulling of more than 20 pounds and no awkward neck motions.  (*Id.*; Tr. 311; Tr. 313).  He also recommended Motrin 800 "as necessary."  (*Id.*).

On, February 13, 2008, Norfolk was evaluated by neurosurgeon Dr. Asim Mahmood. (Tr. 316).  He reported pain in his right shoulder blade that radiated to his right arm and parasthesias in his right upper arm with weakness in his right hand.  (*Id.*).  He reported no significant relief with physical therapy and that he was taking Vicodin and ibuprofen "as needed."  (*Id.*).  On exam, the range of motion in his right arm was decreased, and his strength in his fingers was 3/5, while the rest of his strength was 5/5.  (*Id.*).  His sensory exam and reflexes were normal.  (*Id.*).  Dr. Mahmood noted that the MRI showed disc herniation at C5-6 and C6-7, and a suggestion of herniation at T1-T2, which "would fit more with his symptomatology." (*Id.*).  However, since the MRI did not cover that area, Dr. Mahmood ordered an MRI of the thoracic spine.  (*Id.*).  He diagnosed Norfolk with cervicothoracic radiculopathy and noted that "[h]is treatment plan includes physical therapy and possible surgery that would have to wait till we get his second MRI."  (*Id.*).  Dr. Mahmood released Norfolk to work with restrictions of no

lifting more than 15 pounds and no repeated bending or twisting.  (Tr. 317).

A March 28, 2008 MRI of Norfolk's cervical spine showed "multilevel spondylotic changes throughout the cervical spine."  (Tr. 318).  It specifically showed a disc spur at C3-C4 and again at C4-C5 "causing effacement of the thecal sac and cord with mild canal stenosis." (*Id.*).   At C3-C4, "[u]ncovertebral joint arthropathy results in mild to moderate foraminal stenosis," and at C4-C5 it resulted in "mild right and moderate to severe left foraminal stenosis." (*Id.*).   At C5-C6 the MRI found "right paracentral disc spur complex . . . resulting in indentation of the thecal sac and cord with mild to moderate canal stenosis.   Uncovertebral joint arthropathy results in moderate left foraminal stenosis."  (*Id.*).   At C6-C7 there was a "disc spur complex . . . resulting in indentation of the thecal sac and cord with mild to moderate canal stenosis."  (*Id.*). At C7-T1, "no significant abnormality" was noted."  (*Id.*).

At a follow-up appointment on March 31, 2008, Norfolk continued to report parasthesias and numbness in his right arm and hand, as well as some neck pain.  (Tr. 321).  His pain score was 7/10.  (*Id.*).   Upon examination, Dr. Mahmood noted a decreased range of motion in Norfolk's right arm and his intrinsic hand strength was 4/5.  (*Id.*).   He noted that the MRI had shown no disc herniation either at C7-T1 or at T1-T2, so he ordered an EMG to rule out ulnar neuropathy.  (*Id.*).   Dr. Mahmood noted that Norfolk's symptoms "are not typical of cervical radiculopathy and his parasthesias may be secondary to myelopathy."  (*Id.*).   He signed a return to work note on the same day, recommending that Norfolk be excused from all work "until further evaluation" due to "cervical radiculopathy."  (Tr. 320).  At a follow-up appointment on May 19, 2008, Norfolk continued to report pain in his neck but no pain in his arms or parasthesias in his hand.  (Tr. 323).  His pain score was 8/10.  (*Id.*).   His neck range of motion was decreased but his strength was 5/5.  (*Id.*).   Dr. Mahmood prescribed physical therapy and a

recheck in two months to determine "at that time if he can return back to work in any capacity." (*Id.*).  Dr. Mahmood signed another off work slip for Norfolk for the period of May 19, 2008, through July 22, 2008, with a diagnosis of cervical radiculopathy.  (Tr. 322).  Norfolk attended a physical therapy evaluation on June 2, 2008, which found that he had "good rehabilitation potential."  (Tr. 324-25).  The recommendation was for 8-12 visits over 4 weeks.  (Tr. 325).  However, there are no notes in the record of the results of these treatments, although later follow-up with Dr. Mahmood indicates that he was attending therapy.  (Tr. 245).

In the interim, Norfolk returned to Dr. Walavalkar complaining of a headache secondary to the pulling of a wisdom tooth.  (Tr. 258).  At the time he had "no other complaints."  (*Id.*).  Dr. Walavalkar recommended increasing the Motrin he was taking for his tooth and follow-up in a month.  (*Id.*).

Norfolk returned to Dr. Mahmood on July 21, 2008.  (Tr. 245).  He reported continued pain in his neck but no radiation to his upper extremities.  (*Id.*).  He found "some relief" with physical therapy.  (*Id.*).  Upon examination, Norfolk's pain score was 6/10, and his range of motion was decreased in his neck but normal in his upper extremities.  (*Id.*).  His strength was 5/5.  (*Id.*).  Dr. Mahmood referred Norfolk to the pain clinic and deemed him "still totally disabled at the present time."  (*Id.*).  Dr. Mahmood signed another off-work note for the period from July 21, 2008 through September 24, 2008.  (Tr. 326).  There are no notes in the record from any pain clinic visits.  At a follow-up appointment on January 19, 2009, Norfolk reported continued pain in his neck, which radiated to his shoulders and down his right arm to his little and ring fingers.  (Tr. 244).  Upon examination, Dr. Mahmood noted decreased range of motion in Norfolk's neck and upper extremities, with strength in the right tricep at 4+ and strength everywhere else at 5/5.  (*Id.*).  The doctor concluded that Norfolk "requires C4-C5 diskectomy

and C6 corpectomy and fusion." (*Id.*). Norfolk responded that he wanted to think about it. (*Id.*). There are no further treatment records in the file.

*ii.     Lower Back Pain*

At a May 11, 2009 appointment with Dr. Walavalkar, Norfolk reported back pain and that his back was "getting stiff." (Tr. 257). He reported difficulty standing up, but no radiation to his leg. (*Id.*). His doctor noted mild lumbosacral tenderness upon examination. (*Id.*). He also noted a normal, but painful, range of motion in the spine, a normal straight leg raising test and normal reflexes. (*Id.*). He ordered an x-ray of the area and recommended that Norfolk continue with his pain medication. (*Id.*). Norfolk underwent an MRI of his lower back on July 30, 2009. (Tr. 278). The MRI found that there was a "[d]iffuse disc bulge identified with some effacement of thecal sac anteriorly posterior to the L5-S1 slightly extension of the disc material into foramina mostly right-sided. Negative for any spinal stenosis. Findings may suggest minimal narrowing of the right intervertebral foramina of L5-S1." (*Id.*).

*b.     Consultative and Non-Examining Sources*

Norfolk underwent a consultative examination with Dr. Jack Belen on June 2, 2009. (Tr. 265). At the exam, he complained of neck pain that radiated into his right shoulder and right upper arm and down into the last two fingers on his right hand. (*Id.*). Dr. Belen reviewed the notes from Concentra, Dr. Mahmood, and the March 28, 2008 MRI. (Tr. 265-66). Norfolk reported that he saw no relief from physical therapy and that Dr. Mahmood suggested surgery but that "patient is reluctant at this time." (Tr. 266). Norfolk reported that he was taking Vicodin and Tylenol Arthritis for his pain. (*Id.*). He reported only being able to sit for 30 minutes, that stooping, bending and standing hurt his lower back, and pushing, pulling and carrying was limited to less than 10 pounds with his right arm "by his physician." (*Id.*). He

15

reported being able to button his shirt but not tie his shoes. (*Id.*). He could dress himself otherwise, dial a phone, open a door, make a fist, pick up a coin, write his name and hold a pencil. (*Id.*). He reported being able to climb stairs. (*Id.*).

Upon examination, Dr. Belen noted symmetrical deep tendon reflexes in Norfolk's upper extremities. (*Id.*). He noted tenderness in the cervical paraspinal area and into the intrascapular area bilaterally. (*Id.*). He also noted some tenderness in the lumbosacral paraspinal area. (*Id.*). He found Norfolk able to walk without ambulatory devices and with a steady gait. (*Id.*). He was also able to walk on his heels and toes and his tandem gait was normal. (*Id.*). A straight leg raising test at 60 degrees resulted in low back pain. (Tr. 266). Dr. Belen also found 4/5 strength in Norfolk's right triceps and right finger and wrist extensors. (Tr. 267). His right hand intrinsics were also 4/5, while his left upper extremity strength was 5/5. (*Id.*). Norfolk's cervical range of motion showed 30 degrees of flexion and extension, 10 degrees of side bending bilaterally, right rotation of 15 degrees and left rotation of 30 degrees. (*Id.*). Norfolk complained of pain with all of these motions. (*Id.*). In the lower back, Dr. Belen noted 60 degrees of forward flexion, extension of 15 degrees and side bending of 15 degrees bilaterally. (*Id.*). Pain was also noted with all these motions. (*Id.*). Dr. Belen assessed Norfolk with multi-level cervical disc abnormality, cervical radiculopathy, and lumbosacral myofascitis. (*Id.*). He concluded that "[t]his patient does have significant cervical spine dysfunction [which] result[s] in radiculopathy into the right upper extremity that is causing neurological deficit. He does require narcotic analgesics." (*Id.*). In a supplemental report, Dr. Belen accepted all of Norfolk's reported physical limitations in his own assessment of Norfolk's current abilities. (Tr. 261). There is no indication that he independently verified any of these reports. (*Id.*).

A physical residual functional capacity assessment ("RFC") was completed by Dr.

William Joh for the State of Michigan upon review of Norfolk's records.  (Tr. 268-75).  He found Norfolk capable of lifting 50 pounds occasionally and 25 pounds frequently, and able to stand and/or walk about 6 hours a day and sit for the same amount of time.  (Tr. 269).  He further found Norfolk's ability to push and pull unlimited within his lifting/carrying range.  (*Id.*).  He determined that Norfolk could occasionally climb ramps, stairs, ladders, ropes and scaffolds, and occasionally stoop, kneel or crawl.  (Tr. 270).  He could frequently balance and crouch.  (*Id.*).  He was limited in his ability to reach in all directions, but had no other limitations.  (Tr. 270-72).

### 4.    *Vocational Expert's Testimony*

VE Dennis Gustafson testified that Norfolk's prior work as a materials handler was medium and skilled, and his work as a warehouse supervisor was light and skilled.  (Tr. 45).  The ALJ then posed a hypothetical, asking the VE to consider a claimant of Norfolk's age, education, and vocational background, who "could lift up to 10 pounds frequently.  10 pounds occasionally.  Stand two out of eight hours.  Sit six out of eight hours.  Needs a sit-stand option . . . at will, at the same place.  Not moving around . . . continuing to work."  (Tr. 46).  The VE testified that such a person could not perform any of Norfolk's past relevant work, but could perform unskilled sedentary jobs such as general office clerk (136,370 jobs in the national economy), billing and closing clerk (14,000 jobs), accounting-related clerk (4,450 jobs), credit authorizer and checker (18,200 jobs), interviewer (33,250 jobs), order clerk (25, 770 jobs), or receptionist and information clerk (85,700 jobs).  (Tr. 48-50).  The ALJ then asked whether altering the hypothetical to include a limitation of only occasional writing or typing, up to 1/3 of the day, would alter the VE's testimony.  (Tr. 50-51).  The VE testified that such a limitation would eliminate the billing and closing clerk, accounting-related clerk and order clerk positions.  (Tr. 51-52).  He further testified that the number of receptionist and information clerk positions,

17

credit authorizer and checker positions and interviewer positions would be reduced by half, and the number of general office clerk positions would be reduced by 25%, due to this limitation. (Tr. 51-53).   The VE testified that his testimony was consistent with the Dictionary of Occupational Titles.  (Tr. 53).

### C.        Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

18

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

###### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Norfolk not disabled.  At Step One, she found that Norfolk had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 12).  At Step Two she determined that he had the following severe impairments: "[m]ulti-level degenerative changes of the cervical spine including spinal stenosis and cervical spondylosis."  (*Id.*).  She concluded his reported right arm numbness and tingling was not severe because they were based solely on his subjective reports.  (Tr. 12-13).  At Step Three the ALJ determined that none of Norfolk's conditions, either alone or in combination, met or medically equaled a listed impairment, specifically looking at Listing 1.04 "Disorders of the Spine." (Tr. 13).  She then assessed Norfolk's RFC, finding him capable of performing:

> sedentary work as defined in 20 CFR 404.1567(a) meaning that he can frequently lift up to 10 pounds and can occasionally lift 10 pounds, can stand for 2 hours out of an 8-hour day, sit for 6 hours out of an 8-hour day, and requires the ability to alternate between sitting and standing in place at will.

(*Id.*).  At Step Four, she determined that this RFC assessment prevented Norfolk from returning to his past work.  (Tr. 18).  However, at Step Five, she concluded that, based on his age, education, vocational background, and RFC, a significant number of jobs existed in the national economy that he could still perform.  (Tr. 18-19).  Therefore, Norfolk was not disabled.  (Tr. 19).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

20

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Norfolk argues that the ALJ erred in failing to find that he met the criteria for Listing 1.04 "Disorders of the Spine" with regard to his cervical spine.  Intertwined with this argument is an argument that the ALJ erred in her credibility determination regarding Norfolk's reports and testimony about the numbness and tingling in his right arm.  The court addresses both arguments together.

Listing 1.04, entitled "Disorders of the Spine," is met when a claimant shows that he or she has been diagnosed with one of a number of different spinal disorders, including spinal stenosis, osteoarthritis or degenerative disc disease, resulting in compromise of a nerve root or the spinal cord, along with one of three alternative groups of criteria.  The group pertinent to Norfolk's argument here requires:

> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, §1.00(K)(1). The ALJ found that Norfolk did not meet this listing, in part, because "there is no evidence of consistent or recent nerve root compression, consistent limitation of motion in the spine, or any evidence of motor loss or sensory or reflex loss." (Tr. 13). Norfolk argues that he meets this listing because he was diagnosed with spinal stenosis and, he argues, his MRIs and various treatment notes show nerve root compression in his right arm. For example, Norfolk points to the November 29, 2007 MRI, which showed effacement of the spinal cord at C3-C6. (Tr. 328). He also points to the consultative examination of Dr. Belen, which found "radiculopathy in the right upper extremity that is causing neurological deficit," and "reduced grip strength and reduced cervical range of motion." (Tr. 266-67).

However, even accepting, for the sake of argument, that the evidence Norfolk cites above shows nerve root impingement, and the court does not decide that issue, such evidence is still insufficient to satisfy the requirements of paragraph A, which requires, in addition to evidence of nerve root compression, evidence of "sensory or reflex loss . . ." Listing 1.04(A); *see also Burbo v. Comm'r of Soc. Sec.*, 2011 U.S. App. LEXIS 26143 at *4 (holding that while claimant "cites to evidence that could suggest a nerve root compression in his cervical [spine] . . . as required by Listing 1.04(A), he still does not satisfy the requirements of that section" where "[h]is medical examinations did not document the sensory or reflex deficits in his upper extremities that would be required to establish a cervical spine condition."). While Norfolk made periodic complaints of numbness in his right hand, particularly his ring and little fingers, there is no medical evidence of record to support his subjective complaints. All but one of the treating records that noted examinations of Norfolk's senses or reflexes found no deficits in either area. (Tr. 183; 185; 187; 189; 204; 232-33; 235-36; 266; 316). Only one treatment record, from Dr. Liem on January 10,

2008, found any issue with Norfolk's reflexes.  Dr. Liem noted a sluggish reflex response in Norfolk's bicep, tricep, and brachioradialis reflexes of 1+, but even then, that was found *bilaterally*, not only in his right arm, which is the arm of which he complains.  (Tr. 236).  The symmetrical findings belie the conclusion that Norfolk's right-side reflex responses satisfy Listing 1.04's requirements.  *See* Alexander G. Reeves & Rand S. Swenson, Disorders of the Nervous System, Chapter 8 – Reflex Evaluation (2008) (www.dartmouth.edu/~dons/part_1/chapter_8.html) (last visited October 26, 2012) ("Almost any grade of reflex (outside of sustained clonus) can be normal.  Asymmetry of reflexes is a key for determining normalcy when extremes of response do not make the designation obvious."); *see also* Treatment notes further suggest that an EMG test rendered "essentially negative" results, although the EMG itself is not in the file.  (Tr. 232).

The ALJ addressed the lack of evidence of sensory or reflex loss at Step 3 in her decision, and she also addressed it at Step 2, where she found that Norfolk's subjective complaints of numbness in his right arm did not even rise to the level of a severe impairment because they were based on nothing more than his own subjective complaints.  (Tr. 12-13).  Norfolk, in his brief to the court, seemingly contradicts his position by specifically stating that he does not take issue with the ALJ's Step Two findings, yet arguing that the ALJ erred in not finding credible his subjective complaints of tingling and numbness in his right arm.  (*See*. Plf. Brf. at 2; 4).

Norfolk argues that the ALJ erred in finding that no objective medical evidence supported these complaints, and cites diagnoses of physicians and MRIs showing the existence of spinal stenosis.  However, the issue is not that the ALJ failed to conclude that Norfolk suffered spinal stenosis.  In fact, she specifically did find such a severe impairment in her Step Two analysis.  (Tr. 12).  However, as outlined above, the ALJ did not find any objective

evidence showing that the stenosis caused tingling or numbness in Norfolk's right arm, and noted that the objective medical evidence of record specifically did not support such a finding. (Tr. 12).

The ALJ went on to find that, while Norfolk's severe conditions could objectively be found to result in disabling pain, his subjective complaints of pain were only "partially credible." (Tr. 16). As support for her credibility determination, the ALJ cited the fact that Norfolk: (1) voluntarily stopped treatment after May 2009 despite having insurance coverage; (2) currently only took over-the-counter pain medication to control his pain; (3) did not continue physical therapy and never sought out alternative treatments; (4) had never been prescribed a walking device; (5) admitted to not being fully compliant with at-home exercise, and (6) that none of his physicians' restrictions distinguished between his right and left arms. (Tr. 16-17).[1]

The ALJ properly considered these facts in finding that Norfolk was "not entirely credible." (Tr. 16). *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (ALJ's credibility determination proper where based in part on claimant's failure to take more than over-the-counter medications for pain); *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (failure to seek continued treatment undercuts complaints of disabling pain); SSR 96-7p, 1996 SSR LEXIS 4 at *21-22 (medical records showing failure to

---

[1] The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

comply with prescribed treatment can be considered in credibility determination where "there are no good reasons for this failure."). Norfolk's contention that the ALJ's credibility determination "is based on the negative aspects of the case, rather than the case as a whole" is incorrect. Doc. #14 at 6. Rather, the ALJ provided a fair and detailed discussion of the many valid reasons for discounting Norfolk's credibility. (Tr. 16-17). For instance, while Norfolk obtained substantial pain relief from physical therapy, he later stopped, and never returned to it as a means of pain relief and/or as an alternative to more invasive treatment. (Tr. 16). The ALJ is correct that "it is logical to assume that had [Norfolk] continued with physical therapy, he may have experienced continued relief from pain." (*Id.*). Regardless of the fact that walking devices can be purchased without a prescription, the ALJ is also correct to conclude that Norfolk's physicians' failure to prescribe one for him "indicates that [his] complaints of an inability to stand and walk were not as severe as alleged." (Tr. 16-17). Finally, it is worth reiterating that the ALJ did not entirely discredit Norfolk's complaints of pain, but rather found him to be only "partially credible" on that issue. (Tr. 16). The ALJ's determination was fair and should not be disturbed.

In sum, based on the evidence presented, the court finds that the ALJ did not err in concluding that Norfolk's condition did not meet or medically equal Listing 1.04, and she similarly did not err in her assessment of his credibility. Further, based on a review of the entire record, the court finds that her decision as a whole is supported by substantial evidence of record and should be affirmed.[2]

---

[2] Norfolk makes one additional conclusory argument, that the ALJ erred in finding that he had the RFC to perform sedentary work when he "would be unable to sustain competitive employment based on his inability to maintain the pace, concentration and persistence required for the jobs outlined in the ALJ's decision." Not only is this argument completely undeveloped, and therefore waived, (*see Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist.

### III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Norfolk's Motion for Summary Judgment **[10]** be **DENIED**, the Commissioner's Motion **[13]** be **GRANTED** and this case be **AFFIRMED**.

Dated: October 30, 2012                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

---

LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted)), there is no virtually no evidence in the record that Norfolk ever asserted such an impairment (besides a mention in passing in a function report), and there is no objective evidence in the record upon which to base this argument. Therefore, the court does not address it.

26

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 30, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager